**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
**Competitive Enterprise Institute,**       )
                                            )
         **Plaintiff,**                     )
                                            )
              v.                            )        **Civil No. 14-cv-01806 (APM)**
                                            )
**Office of Science and Technology Policy,**)
                                            )
         **Defendant.**                     )
_____     )

## MEMORANDUM OPINION

### I.     INTRODUCTION

Starting on January 8, 2014, the White House's website hosted a video featuring the

Director of the White House Office of Science & Technology Policy (OSTP), Dr. John Holdren,

in which Holdren asserted that there was a growing body of evidence linking the weather

phenomenon known as the "Polar Vortex" to global warming.  A blog post on the White House's

website on that same date made a similar claim.  Plaintiff Competitive Enterprise Institute (CEI)

thereafter petitioned OSTP under the Information Quality Act to correct the two claims, asserting

that the linkage between the Polar Vortex and global warming—a connection some scientists had

questioned—was dubious.  In a letter addressed to CEI dated June 6, 2014, OSTP refused to make

the requested corrections.

CEI then filed a request under the Freedom of Information Act (FOIA) seeking two

categories of records.  First, CEI asked for documents concerning OSTP's refusal to correct the

claims made in the video and the blog post.  Second, CEI sought disclosure of documents relating

to OSTP's production of the video.  OSTP produced some documents with redactions and withheld

others in full.  According to OSTP, the redacted and withheld material is subject to the deliberative process privilege and thus exempt from production under FOIA Exemption 5, 5 U.S.C. § 552(b)(5).

Before the court are the parties' cross-motions for summary judgment, along with a request by Plaintiff for discovery regarding the adequacy of OSTP's search.  For the reasons explained herein, Defendant's Motion is granted in part and denied in part and Plaintiff's Cross-Motion is granted in part and denied in part.

## II.      BACKGROUND

### A.      Factual Background

#### 1.      CEI's Request for Correction

On January 8, 2014, a video entitled *The Polar Vortex Explained in 2 Minutes*, featuring the Director of OSTP, Dr. John P. Holdren, was posted to the White House website.  Def.'s Mot. Summ. J., ECF No. 9 [hereinafter Def.'s Mot.], Exhibits [hereinafter Exs.], ECF No. 9-2, at 2.[1]  In that video, Holdren stated that "[a] growing body of evidence suggests that the kind of extreme cold [, *i.e.*, the Polar Vortex] being experienced by much of the United States as we speak is a pattern that we can expect to see with increasing frequency as global warming continues."  *Id.* at 3.  That same day, OSTP Senior Communications Advisor and Web Editor Becky Fried wrote a blog post that featured the video and asserted that "we also know that this week's cold spell is of a type there's reason to believe may become more frequent in a world that's getting warmer, on average, because of greenhouse-gas pollution."  *Id.*

Three months later, on April 14, 2014, CEI submitted to OSTP a request for correction of information under the Information Quality Act (also known as the Data Quality Act) (the "Request

---

[1] For ease of reference, the page citations to the exhibits to Defendant's Motion for Summary Judgment correspond to the ECF electronic page numbers and will be cited as "Def.'s Mot., Exs. at #."

for Correction").   *Id.* at 2-12.   CEI is a "public policy research and educational institute in Washington, D.C., dedicated to opposing overregulation and to promoting economically sustainable environmental policy."  Compl. ¶ 7.  According to CEI, OSTP guidelines "require the agency to correct any published information that does not meet 'basic standards of quality, including objectivity, utility and integrity.'"[2]

CEI asked OSTP to correct Holdren's and Fried's statements positing a connection between the Polar Vortex and global warming.  CEI sought correction of these statements because "the evidence (including the conclusions of peer-reviewed scholarly articles) indicates that the kind of extreme cold experienced in the United States this past winter is not linked to global warming" and that "Holdren's claim of 'a growing body of evidence' is contradicted by peer-reviewed studies."  Def.'s Mot., Exs. at 3.  CEI summarized and cited numerous studies refuting and criticizing Holdren's claim, *id.* at 4-9, and requested that OSTP remove the video and the blog post from the White House website and also take other corrective measures.

### 2.   *OSTP's Response to CEI's Request for Correction*

On June 6, 2014, Tamara Dickinson, OSTP's Principal Assistant Director for Environment and Energy, sent a three-page letter to CEI denying its Request for Correction (the "OSTP Letter").  *Id.* at 14-17.  The OSTP Letter first acknowledged receipt of CEI's Request for Correction and summarized it.  *Id.* at 14.  It then summarized Holdren's statements in the video about the possible link between the Polar Vortex and global warming and stated that "Dr. Holdren firmly stands by the integrity and accuracy of his statements in the polar vortex video."  *Id.* at 15.  The OSTP Letter continued:  "The polar vortex video did not claim to present a comprehensive review of the

---

[2] Def.'s Mot., Exs. at 2, n. 3 (citing Office of Science and Technology Policy, Executive Office of the President, Final Guidelines for Ensuring the Quality of Disseminated Information (October 1, 2002) available at http://www.whitehouse.gov/sites/default/files/microsiftes/ostp/ostp-iqg.pdf).

scientific literature in its two-minute run time.  Nor was it a recitation of relevant scientific literature that failed to reference contradictory citations.  Rather, it was an expression of Holdren's *personal opinion and expert judgment* on the balance of evidence."  *Id.* (emphasis added).  The OSTP Letter noted that Holdren had used the words "'I believe'" as "an expression of his expert judgment and *personal* opinion."  *Id.* (emphasis added).  It characterized Fried's blog post the same way:  "Similarly, the blog post by Ms. Becky Fried expressed a viewpoint and opinion using language including 'there's reason to believe.'"  *Id.*

The OSTP Letter then informed CEI why its Request for Correction was being denied.  The Letter explained that OSTP's "Information Quality Guidelines . . . state that opinions and policy positions are expressly excluded from the legal definition of 'information,' and are not subject to OSTP's Information Quality Act Guidelines."  *Id.*  It concluded:  "Accordingly, OSTP has determined that the Information Quality Act does not apply to the opinions stated by Dr. Holdren and Ms. Fried in the polar vortex video and blog post, respectively."  *Id.*

### 3.    *CEI's Appeal and OSTP's Denial*

On June 19, 2014, CEI submitted an appeal to OSTP's General Counsel Rachael Leonard, arguing that Holdren's and Fried's statements were facts, not opinions, and thus were "information" covered by the Information Quality Act.  *Id.* 19-29.  Leonard affirmed OSTP's decision not to issue a correction.  *Id.* at 31-33.  She concurred that the video contained "an expression of [Holdren's] expert judgment and personal opinion" and concluded that his "expression of his opinion is legally determinative here."  *Id.* at 33.  Because "[o]pinions are expressly excluded from the legal definition of 'information,' and therefore are not subject to correction under the Information Quality Guidelines," she wrote, OSTP was not legally required

to correct the Director's statements.  *Id.*  Leonard concluded the same with respect to Fried's blog post statement.  *Id.*

### 4.    CEI's FOIA Request

On June 13, 2014, CEI submitted a FOIA request to OSTP seeking information about (1) the production of the Polar Vortex video and (2) the OSTP Letter rejecting CEI's Request for Correction.  Specifically, CEI sought:

> (a) All documents referencing or discussing whether the above-quoted claim by Holdren is, or should be regarded as, the position or view of OSTP, or whether it is, or should be regarded as, the personal opinion of Holdren.

> (b) All documents related to the production of the video.  That includes documents related to its cost of production, what agency resources were used in producing it, the amount of staff time that was spent producing it, and whose time was spent producing it.

> (c) All documents referencing or discussing whether the above-quoted claim by Ms. Fried is, or should be regarded as, the position or view of OSTP, or whether it is, or should be regarded as, the personal opinion of Ms. Fried.

*Id.* at 39.

OSTP responded to the FOIA request on July 9, 2014.  *Id.* at 46-59.  OSTP explained that it had conducted a search of its records and had located 11 pages responsive to CEI's request.  *Id.* at 46.  OSTP enclosed those 11 pages, but withheld selected portions of those pages under 5 U.S.C. §§ 552(b)(5) and (b)(6).  *Id.* at 46-58.  Although OSTP's response did not specify the basis for its invocation of Exemption 5, it later defended the redactions on the ground that the withheld material was subject to the deliberative process privilege.  Def.'s Mot. at 10-14.

By letter dated August 4, 2014, CEI appealed OSTP's response to Leonard, arguing that Defendant had fallen short of its obligations under FOIA to adequately search for and produce documents in response to CEI's request.  *Id.* at 61-80.  In particular, CEI complained that the production did not contain any records (1) supporting the cost of producing the video or

5

(2) reflecting internal discussions concerning the conclusion that Holdren's and Fried's statements were personal opinions. *Id.*

Leonard agreed that OSTP had conducted an inadequate search. *Id.* at 78-96. Accordingly, she ordered the OSTP staff to conduct an additional record search "based on [CEI's] original" FOIA request. *Id.* at 79. After the staff conducted an additional search, Leonard reported that OSTP did not have any invoices or bills relating to the video's production. *Id.* The staff did, however, locate a copy of the original OSTP Letter, as well as a one-page calendar entry, which OSTP produced. *Id.* Finally, the staff identified 47 pages consisting of drafts of the OSTP Letter. *Id.* These drafts were "marked with redline edits, track changes, comments and/or notations[.]" *Id.* Leonard determined that, although these pages were responsive to CEI's FOIA request, they were subject to the deliberative process privilege and therefore exempt from disclosure under FOIA Exemption 5. *Id.* She also concluded that there was "no reasonably segregable factual or non-deliberative information" in those 47 pages. *Id.*

## B.    Procedural History

On October 29, 2014, CEI filed its complaint in this court seeking declaratory and injunctive relief against OSTP, claiming primarily that the agency had improperly withheld the 47 draft pages of the OSTP Letter. *See generally*, Compl., ECF No. 1. On January 23, 2015, OSTP filed a Motion for Summary Judgment. *See generally*, Def.'s Mot. OSTP supported its Motion with a declaration from Rachael Leonard, OSTP's General Counsel and Chief FOIA Officer, which included as an attachment a *Vaughn* Index describing the 11 pages of responsive records that OSTP had produced but had redacted in part, mainly pursuant to FOIA Exemption 5.[3]

---

[3] OSTP also redacted certain portions of the 11 pages under FOIA Exemption 6, which shields from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Plaintiff does not challenge OSTP's invocation of that exemption. *See* Compl. at 6-8.

*See* Def.'s Mot., Exs. at 82-96 [hereinafter *Vaughn* Index].  On February 23, 2015, Plaintiff filed a Cross-Motion for Summary Judgment, challenging OSTP's invocation of Exemption 5 to withhold responsive material.  *See* Pl.'s Cross-Mot. for Summ. J., ECF No 10 [hereinafter Pl.'s Mot.].

In its Reply, OSTP made an unexpected admission.  In its Motion for Summary Judgment, Leonard had declared that "the 47 [draft] pages [of the OSTP Letter] remained internal to the Executive Branch," Def.'s Mot., Decl. of Rachael Leonard [hereinafter Leonard Decl.], ECF No. 9-1, ¶ 26, leaving two distinct impressions:  (1) that there were only 47 draft pages of the OSTP Letter and (2) that only Executive Branch officials had reviewed the draft pages.   Those impressions were, in fact, incorrect.  In truth, according to a supplemental declaration submitted by Leonard, OSTP staff consulted with Holdren *after* filing its summary judgment motion and learned that he "had shared one version of the draft response letter with Dr. Jennifer Francis, a professor at Rutgers University. . . .  Dr. Francis then returned the five-page draft to Dr. Holdren with edits and comments" (the "Francis Draft").  Def.'s Reply, Suppl. Decl. of Rachael Leonard [hereinafter Suppl. Leonard Decl.], ECF No. 12-1, ¶¶ 7, 8.  Even though Dr. Francis was not employed by the Executive Branch, OSTP nevertheless claimed that it was entitled to withhold the Francis Draft under the consultant corollary to the deliberative process privilege.  Def.'s Reply at 6-8.

Plaintiff, for its part, vigorously contested OSTP's attempt to apply the consultant corollary.  Pl.'s Reply, ECF No. 14 at 5.  Additionally, Plaintiff asserted that, in light of OSTP's belated disclosure of the Francis Draft, it should be entitled to discover "whether OSTP [had] conducted an adequate search for all responsive documents, whether the relationship between Jennifer Francis and OSTP Director Holdren qualified her as an agency consultant for purposes of

the consultant corollary . . . and whether the remaining drafts withheld truly did remain internal to the Executive Branch." *Id.* at 23-24.

## III.    ANALYSIS

### A.    Standard of Review

Federal Rule of Civil Procedure 56 provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.  R.  Civ.  P.  56(a).   To make this determination, the court must review all "evidence . . . in the light most favorable to the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 245 n.2 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, while a fact is "material" only if it is capable of affecting the outcome of litigation.  *Id.* at 248-49.  A non-material factual dispute is insufficient to prevent the court from granting summary judgment.  *Id.* at 249.

Most FOIA cases are appropriately decided on motions for summary judgment.  *See Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  A court may award summary judgment in a FOIA case by relying on the information included in the agency's affidavits or declarations if they are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted), and if they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981).

"Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to

sustain its action' and directs the district courts to 'determine the matter *de novo*.'"  *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).  To prevail on a motion for summary judgment, an agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements." *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001).

## B.    Exemption 5 and the Deliberative Process Privilege

Under FOIA Exemption 5, an agency may withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  To fall within Exemption 5, the document must satisfy two conditions:  (1) "its source must be a Government agency[,]" and (2) "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

The deliberative process privilege is among the privileges covered by Exemption 5.  That privilege shields from disclosure "all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982) (citation and internal quotation marks omitted).  To determine whether a document is covered by the privilege, courts look to two factors.  First, courts ask whether the document is "predecisional," that is, "whether it was generated before the adoption of an agency policy."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  And, second, courts ask whether the document is "deliberative," meaning "whether it

reflects the give-and-take of the consultative process." *Id.*   As with all FOIA Exemptions, an agency invoking Exemption 5 bears the burden of establishing that it applies.   *Access Reports v. DOJ*, 926 F.2d 1192, 1195 (D.C. Cir. 1991).

### 1.   Drafts of the OSTP Letter

The court first addresses whether the 47 pages of drafts of the OSTP Letter were properly withheld under the deliberative process privilege.   OSTP claims that these pages are "predecisional inasmuch as they were generated to assist the Agency in preparing its final response to CEI's request" and "deliberative in that they reflect edits, comments and advice related to the content of that response."   Def.'s Mot. at 11-12.   According to declarations submitted by Rachael Leonard, the 47 pages were drafts "of the final OSTP Data Quality Act response provided to CEI . . . [which] remained internal to the Executive Branch.   In these 47 pages, OSTP staff were engaged in deliberative conversations and edits in order to help formulate OSTP's response to CEI's Request for Correction."   Leonard Decl. ¶¶ 26-27.   Moreover, "[a]ll 47 pages were marked DRAFT when created, and several pages contain draft edits, including redlines and comment bubbles from OSTP staff."   *Id.*   In her supplemental declaration, Leonard identified each OSTP staff member who reviewed at least one draft version of the Letter:   "Holdren, OSTP's Principal Assistant Director for Environment and Energy, OSTP's Chief of Staff, two career attorneys at OSTP, and two OSTP communications staff."   Suppl. Leonard Decl. ¶ 4.

The Court of Appeals has recognized that drafts can be subject to the deliberative process privilege, and thus exempt from FOIA disclosure, if the drafts are both deliberative and predecisional.   In *Russell v. Department of the Air Force*, the Court considered whether the privilege applied to a draft manuscript of an Air Force historical document discussing the use of Agent Orange and other herbicides during the Vietnam War.   682 F.2d 1045 (D.C. Cir. 1982).   The

draft manuscript, "which emerged from the [Office of Air Force History's (OAFH)] editorial review process, constitute[d] the Air Force's official statement concerning the history of herbicide use in the Vietnam conflict." *Id.* at 1048. The Court of Appeals found that the draft manuscript was "the product of creative debate and candid consideration of the alternatives within the Air Force" as well as other agencies with which it consulted. *Id.* If the draft was disclosed to the public, the Court feared that its authors in the future would be "less inclined to state their own interpretations candidly." *Id.* Disclosing the draft might also confuse the public, the Court explained, because the public could mistakenly interpret the views within a draft as the views of the agency. *Id.* at 1048-49. And, because the only difference between the final document and the draft—the deletion of 20 pages—would reveal what material made the final cut and what was edited out, the Court of Appeals was concerned that disclosure would contravene the purpose of Exemption 5 to "prevent such disrobing of an agency decision-maker's judgment." *Id.* at 1049. For these reasons, the Court of Appeals affirmed the withholding of the draft sought in that case.

In *Dudman Communications Corporation v. Department of the Air Force*, the Court of Appeals applied *Russell* to another draft OAFH document. *See* 815 F.2d 1565 (D.C. Cir. 1987). The Court held that the risks identified in *Russell*—that the "disclosure of editorial judgments" would "stifle the creative thinking and candid exchange of ideas necessary to produce good historical work"—are present even when the public cannot "segregate and specifically identify editorial changes." *Id.* at 1569. As the Court explained, "[t]he danger of 'chilling' arises from disclosure that the Air Force *as an institution* made changes in a draft at some point[—]not from disclosure that particular Air Force employees at particular stages in the editorial process made such changes." *Id.* (emphasis added). The Court held, therefore, that the draft at issue in that case "falls within Exemption 5 as clearly as did the draft in *Russell*." *Id.*; *accord Arthur Anderson &*

*Co.*, 679 F.2d at 259 (holding that drafts of IRS Revenue Ruling and accompanying notes are protected by the deliberative process privilege); *Pies v. IRS*, 668 F.2d 1350, 1354 (D.C. Cir. 1981) (holding that draft proposed regulations and related documents that were never subjected to final review were predecisional and thus exempt under Exemption 5).

Following *Russell* and *Dudman*, courts in this District have held, in many instances, that drafts are protected by the deliberative process privilege. *See, e.g.*, *Elec. Privacy Info. Cntr. v. DHS*, 928 F. Supp. 2d 139, 151-52 (D.D.C. 2013) (deeming numerous draft documents to be protected under the deliberative process privilege and rejecting plaintiff's assertion that to protect a "draft" document, an agency must identify a corresponding final document); *ViroPharma Inc. v. DHS*, 839 F. Supp. 2d 184, 193 (D.D.C. 2012) (holding that various draft documents were properly withheld by the FDA because "[t]he choice of what factual material and prior final agency opinions to include or remove during the *drafting* process is itself often part of the *deliberative process*, and thus is properly exempt under Exemption 5") (emphasis added); *Techserve Alliance v. Napolitano*, 803 F. Supp. 2d 16, 28 (D.D.C. 2011) (holding that a draft of the Office of the Inspector General's review of the Benefit Fraud Referral Process containing predecisional commentary was protected by the deliberative process privilege); *Goodrich Corp. v. EPA*, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) (holding that EPA was permitted to withhold the factual content and data contained within a draft model under Exemption 5 because "evolving iterations of the model's inputs and calibration reflect the opinions of the staff currently developing the model, which may not represent EPA's ultimate opinions relating to these matters"; "[E]ven if the data plugged into the model is itself purely factual, the selection and calibration of data is part of the deliberative process to which Exemption 5 applies."); *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 206 (D.D.C. 2007) (drafts of FERC report reflecting staff's thoughts during the process of

determining whether alleged market abuses caused the California energy crisis were protected by the deliberative process privilege).

Applying the foregoing decisions, the court finds that the 47 draft pages of the OSTP Letter were covered by the deliberative process privilege and thus properly withheld from production under Exemption 5.  The drafts plainly were predecisional—they preceded in time the final version of OSTP Letter.  And they were deliberative—they reflect the opinions, reactions, and comments of OSTP employees to the OSTP Letter.  *See Coastal States Gas Corp.*, 617 F.2d at 866 (describing as "deliberative" documents that "reflect[] the give-and-take of the consultative process" and stating that the "exemption thus covers recommendations, *draft documents*, proposals, suggestions, and other subjective documents which reflect personal opinions of the writer rather than the policy of the agency") (emphasis added).  Moreover, the same concerns over disclosure that animated *Russell* and *Dudman*—stifling creative thinking, confusing the public, and "disrobing the agency decision maker's judgment"—apply equally here.  Court-ordered disclosure of the 47 pages unquestionably would have a chilling effect on the free exchange of ideas and viewpoints that the deliberative process privilege is meant to encourage and protect.

Plaintiff raises a handful of arguments to contest application of the deliberative process privilege to the 47 draft pages.  First, Plaintiff argues that the privilege does not apply because the drafts do not "relate to developing agency policies or regulations[; rather, the] documents . . . relate merely to a video that OSTP claimed was just the 'personal opinion' of its staff and not the agency itself."  Pl.'s Mot. at 9.  Plaintiff's argument correctly frames the law, but misapplies it to the facts at issue.  It is true that, for the privilege to apply, "the document [at issue] must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters."  *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975); *see also Petroleum*

*Information Corp. v. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (stating that the deliberative process privilege "is centrally concerned with protecting the process by which *policy* is formulated"). In other words, "[t]he privilege does not protect a document which is merely peripheral to actual policy formation." *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir. 1994).

But the drafts at issue here are not "merely peripheral" to a legal or policy matter. On the contrary, they relate directly to a legal matter. The OSTP Letter expressed OSTP's *legal position* on whether the Information Quality Act and implementing guidelines required it to correct statements made in the Polar Vortex video and in the related blog post. Def.'s Mot., Exs. at 15 ("On this *legal basis*, OSTP denies your request for information correction under the Information Quality Act.") (emphasis added). Thus, Plaintiff mischaracterizes the OSTP Letter when it asserts that the Letter simply concerns Holdren's "'personal opinion' unconnected to agency policy formulation." Pl.'s Mot. at 12. And, although the agency came to the conclusion that the views expressed by Holdren and Fried were expressions of their personal opinions rather than of agency policy, the *process* by which the agency arrived at that legal conclusion is protected.

Next, Plaintiff argues that the agency failed to meet its burden to demonstrate that the privilege applies, because it failed to specify the individuals who "received, reviewed or authored" the drafts and failed to explain "what their respective positions are in the decisional hierarchy." *See* Pl.'s Reply at 11-15. The court disagrees. There is no categorical rule that an agency must provide such detail to assert the deliberative process privilege. It is true that the lack of such information may, in some cases, prevent a court from making a privilege determination. *See, e.g.*, *Ethyl Corp.*, 25 F.3d at 1250 (holding that because the agency did not identify the authors or recipients, the court could not identify those "persons' relationships to the decisionmaking process"); *Center for Biological Diversity v. Gutierrez*, 451 F. Supp. 2d 57, 68 (D.D.C. 2006)

14

(holding that, because the agency did not identify senders and recipients, the court could not determine whether the withheld documents were "part of a clear process leading to a . . . decision" (internal quotation marks omitted)).  But the absence of such detail is not necessarily fatal.  What is essential is that an agency provide information sufficient to allow a court to determine that the document is part of a deliberative process.  *See, e.g.*, *SafeCard Servs.*, 926 F.2d at 1204 (stating that "to carry its burden, the agency must describe not only the contents of the document, but also enough about its context, *viz.* the agency's decisionmaking process").

Here, OSTP has met its burden.  In her Supplemental Declaration, Leonard identified the OSTP staff members who reviewed the drafts.  They included "Holdren, OSTP's Principal Assistant Director for Environment and Energy, OSTP's Chief of Staff, two career attorneys at OSTP, and two OSTP communications staff."  Supp. Leonard Decl. ¶ 4.  OSTP also consulted with three Office of Management and Budget (OMB) staff members—one of whom provided written comments—"to confirm that OSTP was correctly interpreting and applying OMB's . . . Information Quality Act guidelines." *Id.* ¶ 5.  The court agrees that Defendant could have provided a more fulsome explanation of the drafting process, for example, by distinguishing between who authored the original draft and who made edits or comments and by specifying the dates on which those edits and comments were made.  But the information OSTP provided is sufficient.  It identified the positions of the OSTP employees who reviewed and commented on the OSTP Letter. From that information, the court readily can infer that the drafts were "part of the process by which [OSTP] came to [its] final decision." *Abtew v. DHS*, 808 F.3d 895, 899 (D.C. Cir. 2015).

Finally, Plaintiff argues that, even if portions of the drafts are exempt from disclosure, the drafts in their entirety cannot be withheld because much of the OSTP Letter includes recitations of historical facts, such as what Holdren said in the video, that are "reasonably segregable."

5 U.S.C. § 552(b); *see also* Pl.'s Mot. at 17.  The court disagrees.  The Court of Appeals recently rejected a similar argument that factual material in a draft was reasonably segregable:  "Our cases have made clear that a draft agency history may not be dissected by the courts in the manner suggested by" the plaintiff.  *National Sec. Archive v. CIA*, 752 F.3d 460, 465 (D.C. Cir. 2014) (citing *Dudman*, 815 F.2d at 1568-69; *Russell*, 682 F.2d at 1048-49).  The Court explained that, "[i]n producing a draft agency history, the writer necessarily must 'cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose,' and 'identify the significant issues.'"  *Id.* (quoting *Mapother v. DOJ*, 3 F.3d 1533, 1538 (D.C. Cir. 1993)).

The drafts of the three-page OSTP Letter are obviously far less robust than an agency history.  But some of the same concerns with respect to segregability identified in *National Security Archive* are applicable here.  The deliberative process privilege protects not only the content of drafts, but also the drafting process itself.  *See National Sec. Archive*, 752 F.3d at 465; *Dudman*, 815 F.2d at 1569; *see also Marzen v. Dep't of Health & Human Servs.*, 825 F.2d 1148, 1155 (7th Cir. 1987) (stating that the "exemption protects not only the opinion, comments and recommendations in the draft but also the process itself").  The 47 pages at issue here consisted of 10 different drafts of the OSTP Letter, reviewed by seven different people within OSTP.  Suppl. Leonard Decl. ¶ 3.  Any effort to segregate the "factual" portions of the drafts, as distinct from their "deliberative" portions, would run the risk of revealing "editorial judgments—for example, decisions to insert or delete material or to change a draft's focus or emphasis."  *Dudman*, 815 F.2d at 1569.  Such differences easily could be discerned by comparing the final letter with an earlier version.  Accordingly, because even disclosure of the factual material in the OSTP Letter, and nothing more, could reveal judgments made during the drafting process itself, the court will not order disclosure of any portion of the drafts.

2.      *The Consultant Corollary*

The court turns next to the five draft pages of the OSTP Letter that Holdren shared with Dr. Francis, a Rutgers University professor.  OSTP insists that those five pages are subject to the deliberative process privilege under the "consultant corollary" and thus are exempt from disclosure.  Def.'s Reply at 6-8.

Consistent with the statutory text, the Supreme Court has emphasized that to qualify for protection under Exemption 5 "the communication must be 'inter-agency or intra-agency.'"  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001) (quoting 5 U.S.C. § 552(b)(5)).  Our Court of Appeals, however, has recognized that protection under Exemption 5 can extend to some communications between agency employees and outside consultants.  As the Court of Appeals explained in *Public Citizen v. Department of Justice*:   "[R]ecords of communications between an agency and outside consultants qualify as intra-agency for purposes of Exemption 5 if they have been created for the purpose of aiding the *agency's* deliberative process."  111 F.3d at 170 (D.C. Cir. 1997) (citations and internal quotation marks omitted); *see also Ryan v. DOJ*, 617 F.2d 781, 789-90 (D.C. Cir. 1981) ("When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum.").  Under what has come to be known as the "consultant corollary," it is "'irrelevant' whether the author of the document is 'a regular agency employee or a temporary consultant.'"  *Public Citizen*, 111 F.3d at 170 (quoting *Formaldehyde Inst. v. Dep't of Health and Human Servs.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989)).

In *Klamath*, the Supreme Court observed that a number of circuits, including ours, have recognized the "consultant corollary."  532 U.S. at 9.  Without passing on the validity of the

exception itself, the Court held that it did not apply to communications exchanged between the Bureau of Indian Affairs and certain Indian Tribes regarding the allocation of water rights.  The Court explained that in the lower court cases recognizing the corollary, "the consultant does not represent an interest of its own . . . when it advises the agency that hires it.  Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do."  *Id.* at 10-11.  Because the Tribes communicated "with the Bureau [of Indian Affairs] with their own, albeit entirely legitimate, interests in mind," the Court held that their communications did not fall within the corollary.  *Id.* at 12.  The Court added, "[w]hile this fact alone distinguishes tribal communications from the consultants' examples recognized by several Courts of Appeals, the distinction is even sharper, in that the Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone."  *Id.*

Since *Klamath*, the Court of Appeals has continued to recognize the consultant corollary in cases where the consultants were deemed not be advocating their own interests.  *See, e.g.*, *Nat'l Inst. of Military Justice v. DOD*, 512 F.3d 677, 683 (D.C. Cir. 2008) ("Unlike the Indian tribes in *Klamath*, the [consultants] had no individual interests to promote in their submissions[.]"); *McKinley v. Bd. of Governors of the Federal Reserve Sys.*, 647 F.3d 331, 337-38 (D.C. Cir. 2011) ("Unlike the Indian tribes, the FRBNY [did] not represent an interest of its own, or the interest of any other client, when it advise[d] the [Board]" (internal quotation marks omitted)).

OSTP asserts that the consultant corollary applies here because "Dr. Holdren sought advice from Professor Francis because she is an expert on the climate-change issues raised by CEI's Request for Correction and the Response the Agency was in the process of drafting."  Def.'s Reply at 8 (citing Leonard Supp. Decl. ¶ 8).  Unlike the Indian Tribes in *Klamath*, OSTP argues,

Dr. Francis was "not advancing her own interests or seeking a government benefit." Def.'s Reply at 8.

In the court's view, the issue is not so clear cut. Whether a person is self-interested in a particular situation is not a binary question. Rather, self-interest exists on a spectrum, with altruism at one end and greed or avarice on the other. The point at which selflessness passes into self-interest is not demarcated by a bright line. Here, OSTP offers little more than bald assertions to support Dr. Francis' purported lack of self-interest in commenting on the OSTP Letter. According to Leonard, "Dr. Francis has published numerous articles concerning climate science and weather patterns in peer-reviewed journals. Holdren shared one draft response with Dr. Francis to seek her outside technical expertise related to the polar vortex." Leonard Supp. Decl. ¶ 8 (citation omitted). Leonard then states in conclusory terms that "Dr. Francis effectively functioned as an agency employee, providing advice to OSTP similar to what Holdren would have sought and received from an OSTP agency employee. In addition, Dr. Francis operated as a technical science expert solely on OSTP's behalf, not advancing her own interests or seeking government benefit." *Id.* Leonard offers no other details about the "consultancy" that Dr. Francis provided to Holdren. She does not explain why Holdren needed to confer with Dr. Francis about the OSTP Letter; to what portions of the letter Dr. Francis contributed her "technical science" expertise about the Polar Vortex; or to what extent Dr. Francis has conferred with Holdren and OSTP in the past about scientific or other issues.

Against this skeletal record, Plaintiff has amassed convincing evidence, without the benefit of discovery and based solely on the public record, showing that Dr. Francis' consultancy was not as selfless as OSTP would have the court believe. Dr. Francis is not just any climate scientist. As Plaintiff states, she is the "originator and chief proponent" of the theory that "global warming

is leading to more severe winter cold."   Pl.'s Reply at 5.   Dr. Francis' research is the "growing body of evidence" that Holdren touted in his video, the very reference that Plaintiff sought to have OSTP correct.   According to various news articles cited by Plaintiff, the theory linking extreme cold events to global warming was "first proposed" by "Jennifer Francis and her collaborators"[4] and is described as "her theory."[5]   Further, she is considered to be its most-known proponent.[6] These articles also highlight that other climate scientists have questioned Francis' theory, *see id.* at 7, n. 19, and that she has staunchly defended it, *see id.* at 6-7 & n. 26.   Moreover, Dr. Francis is the recipient of federal research grants "[i]nvestigating the link between a warming Artic and weather patterns in the continental United States."   *Id.* at 7, n.28.

None of the foregoing should be interpreted as a criticism of Dr. Francis.   Nor should it be interpreted as the court taking a position in the debate that her theory has provoked.   That is not the court's purpose.   Rather, the court recites the foregoing because it clearly shows that, at a minimum, Dr. Francis had a professional and reputational stake in OSTP's decision to reject Plaintiff's request to correct Holdren's and Fried's statements, which endorsed her climate theory. A government consultant, of course, is permitted to have a point of view.   *See Klamath*, 532 U.S. at 10 (observing that "nor do we read the cases [applying the consultant corollary] as necessarily assuming that an outside consultant must be devoid of a definite point of view when the agency

---

[4] Pl.'s Reply at 7 (citing Jason Samenow, *Scientists: Don't make "extreme cold" centerpiece of global warming argument: Climate scientists are pushing back against the notion global warming could mean more extreme cold*, Wash. Post (Feb. 20, 2014) (Jennifer Francis "first proposed" the hypothesis that "global warming [is] the culprit for bone-chilling cold.") (in Westlaw at 2014 WLNR 4759052).

[5] Pl.'s Reply at 8 (citing Seth Borenstein, *Scientists: Americans Are Becoming Weather Wimps*, Pittsburgh Post-Gazette, Jan. 14, 2014, at A2 ("Her theory… says melting Arctic sea ice [caused by global warming] is changing polar weather.") (available in Westlaw at 2014 WLNR 936324); *Why Global Warming Does Not Necessarily Result in Warmer Winter*, The Economist, March 4, 2015 (citing her "controversial" theory that there is "a connection between climate change and colder winters.").

[6] Pl.'s Reply at 8 (citing Amy Ellis Nutt, *The 100+ Club: The Most Influential People in New Jersey* , Star-Ledger, June 1, 2014, at M27 (describing Francis as "one of the leading researchers into how climate-induced alterations of the jet stream may be causing persistent extreme weather.") (in Westlaw at 2014 WLNR 14892397).

contracts for its services"). But here, Dr. Francis cannot be likened to a government employee whose "only obligations are to truth and its sense of what good judgment calls for[.]" *Id.* at 10-11. A decision by OSTP to correct Holdren's and Fried's statements would have been contrary to Dr. Francis' self-interest. Indeed, such an action likely would have been perceived as a rebuke of her climate theory. Thus, Dr. Francis was not "enough like the agency's own personnel to justify calling [her] communications 'intra-agency.'" *Klamath*, 532 U.S. at 12; *see also People for the Am. Way Found. v. Dep't of Educ.*, 516 F. Supp. 2d 28, 39-40 (D.D.C. 2007) (holding that contractors who have an interest in being awarded a subsequent contract did not fall under the corollary).

Critical to the court's conclusion is the context in which Dr. Francis consulted with Holdren. *See SafeCard Servs.*, 926 F.2d at 1204 (stating that the agency must present facts about both the "content[]" and "context" of the document). Dr. Francis did not deliver her advice in this case to assist OSTP with forming a policy position on the claimed connection between the Polar Vortex and global warming. Instead, the letter that Dr. Francis reviewed concerned OSTP's *legal response* to a demand for correction made under Information Quality Act. Indeed, having carefully read the final OSTP letter, the court is left wondering what aspect of the draft letter required Dr. Francis' expertise either on climate science generally or the Polar Vortex in particular. The overwhelming majority of the OSTP Letter (1) repeats the content of CEI's Request for Correction and (2) reiterates Holdren's remarks in the Polar Vortex video, before ultimately concluding that the views expressed by Holdren and Fried are their personal opinions and therefore are not subject to the Information Quality Act. Def.'s Mot., Exs. at 14-16. Nothing apparent on the face of the final letter would have demanded Dr. Francis' "technical expertise related to the polar vortex." *See* Leonard Supp. Decl. ¶ 8. Admittedly, Dr. Francis could have proposed or commented on text

that ultimately was cut from the final version, which might have required her technical expertise. But, if that is the case, OSTP bore the burden of making such information known to the court. *See SafeCard Servs.*, 926 F.2d at 1204. It has offered nothing of the sort.

The court therefore rejects Defendant's attempt to apply the consultant corollary in this case and finds that the five draft pages shared with Dr. Francis are not covered by the deliberative process privilege and cannot be withheld under Exemption 5. Those pages must be disclosed to Plaintiff.

*3.      Email Communications*

Turning now to the 11 pages of emails produced to Plaintiff, the court ordered that those pages be produced *in camera*. *See* Minute Order, December 15, 2015. Based on a review of those pages, as well as OSTP's *Vaughn* Index, the court concludes that OSTP has failed to demonstrate that the deliberative process privilege applies to the withheld material.

As explained earlier, the deliberative process privilege "is centrally concerned with protecting the process by which *policy* is formulated." *Petroleum Info. Corp.*, 976 F.2d at 1435. Generally speaking, the emails concern discussions within OSTP regarding the production of the Holdren video. *See generally*, *Vaughn* Index at 83-86. But the video, and withheld communications about it, do not concern an OSTP policy position. Rather, when OSTP rejected Plaintiff's request for correction, it explained that the video's statements were "an expression of Dr. Holdren's personal opinion." Def.'s Mot., Exs. at 15. If the video was an expression only of Holdren's personal opinion, then it follows that internal communications about the video cannot be part of a process of formulating agency policy. The court's review of the emails confirms that conclusion. Accordingly, OSTP will be ordered to produce in full the 11 pages of emails, except for those portions protected by Exemption 6. *See* n. 3, *supra*.

22

### C.      Plaintiff's Request for Discovery

In its final submission to this court, Plaintiff asked to take discovery based on "OSTP's tardy admission" that it had submitted an inaccurate declaration in support of its motion for summary judgment and had "overlooked" a draft that had been shared outside the government. Pl.'s Reply at 23.   Permitting discovery, Plaintiff argues, would shed light on "whether OSTP conducted an adequate search for all responsive documents" and "whether the remaining drafts withheld truly did remain internal to the Executive Branch." *Id.* at 23-24.

Discovery in FOIA cases is rare.  *Schrecker v. DOJ*, 217 F. Supp. 2d 29, 35 (D.D.C. 2002), *aff'd*, 349 F.3d 657 (D.C. Cir. 2003).   Agency affidavits must be accorded a "presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard*, 926 F.2d at 1200 (citations and internal quotation marks omitted).   Courts must deny requests for discovery "where an agency's declarations are reasonably detailed, submitted in good faith, and the court is satisfied that no factual dispute remains." *Schrecker*, 217 F. Supp. 2d at 35.

Applying these principles, the court holds that OSTP's correction of the record does not warrant the limited discovery sought in this case.   Although the initial Leonard Declaration contained a significant error—asserting that none of the drafts were shared outside the Executive Branch—mistakes alone do not imply bad faith.  *See Fischer v. DOJ*, 723 F. Supp. 2d 104, 109 (D.D.C. 2010) ("To be sure, defendant has not performed its duties under FOIA perfectly, but error-free performance is not required.").   "[T]he agency's cooperative behavior of notifying the court and plaintiff that it had discovered a mistake, if anything, shows good faith." *Fischer*, 723 F. Supp. 2d at 109.  Here, the Supplemental Leonard Declaration explains to the court's satisfaction

why the draft shared with Dr. Francis was not discovered earlier.  Supp. Leonard Decl. ¶¶ 6-7.

Thus, discovery is not warranted on the ground that OSTP has acted in bad faith.

Nor has Plaintiff shown through *evidence* that there is a factual dispute about the existence

of other drafts that were shared outside the Executive Branch.  Rather, Plaintiff merely speculates

that such other drafts might exist because of the late disclosure of the draft shared with Dr. Francis.

But speculation that other documents *might* exist is not enough to overcome the good faith

presumption that must be accorded to agency affidavits, even those that admit error.  *See SafeCard*,

926 F.2d at 1200.  Plaintiff's request for discovery is therefore denied.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion is granted in part and denied in part,

and Plaintiff's Cross-Motion is granted in part and denied in part.  A separate Order accompanies

this Memorandum Opinion.

Dated:  February 10, 2016

Amit P. Mehta
United States District Judge